```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
                         EASTERN DIVISION
```

| | |
|---|---|
| CHERYL EPSTEIN, | ) |
|       Plaintiff, | ) |
| v. | ) No. 06 C 7035 |
| TARGET CORPORATION, | ) Judge John W. Darrah |
| a Delaware corporation, | ) |
|       Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Cheryl Epstein, filed a one-count Complaint against Defendant, Target Corporation ("Target"), in the Circuit Court of Cook County, Illinois, alleging retaliatory discharge. Defendant later removed the action to this Court. Presently pending before this Court is Defendant's Motion for Summary Judgment.

## FACTS

Epstein was employed by Target in various positions beginning in 1987, including employment at Target's Tinley Park, Illinois store, which began in 2005. (Def.'s 56.1(a)(3) Statement ¶ 2). Epstein was employed at the Tinley Park store as a Team Leader in "softlines," an area of the store that sells retail items, such as clothing, shoes, jewelry and accessories. (Id., ¶ 3). As a Team Leader, Epstein was responsible for supervising team members assigned to the softlines area. (Id., ¶ 4). Epstein's primary duties involved working the sales floor, directing the work of team members, training and coaching team members, and performing work with team members on the sales floor, including moving inventory and signage. (Id., ¶ 5).

On June 27, 2006, while working in the store fitting room, Epstein stepped into a hand-held shopping basket that was lying on the ground, twisting her ankle. (Def.'s 56.1(a)(3) Statement ¶ 6). As a result, Epstein suffered severe pain and was unable to stand. (Id., ¶ 7). She immediately left work and sought treatment at Ingalls Urgent Care, where she was diagnosed with a left ankle sprain. (Id., ¶ 7). On June 30, 2006, Epstein had a follow-up appointment, during which the treating physician restricted her to performing work in a seated position with her left foot elevated. (Id., ¶ 8).

Under Target's "Return to Work" program ("the Program"), when an employee is injured at work, Target seeks to temporarily reassign the team member to an alternative position in which the employee is able to perform the essential functions of the job within the physician's established restrictions. (Def.'s 56.1(a)(3) Statement ¶ 9). An employee may continue in the alternative position for a maximum of twelve weeks. (Id., ¶ 10). The purpose of the Program is to help employees stay active in their jobs, help them recover more quickly, and help them reduce or eliminate lost-time claim costs. (Id., ¶ 11). While working in the alternative position, an employee retains their current salary. (Id., ¶ 12).

Pursuant to the Program, when Epstein returned to work on July 6, 2006, she was transferred to the position of fitting room clerk/store operator. (Def.'s 56.1(a)(3) Statement ¶ 13). In order to reassign Epstein, another clerk was transferred from the fitting room to a position on the sales floor. (Id., ¶ 14). As fitting room clerk, Epstein greeted guests who used the fitting room, ticketed and

repackaged clothes, re-hung merchandise, and retrieved items from individual fitting rooms. (Id., ¶ 15). Epstein was also required to answer guest telephone calls and contact other team members regarding their schedules. (Id., ¶ 16). To perform her tasks and make her movement easier, Target provided Epstein with an electric cart. (Id., ¶ 18). During her reassignment, Epstein maintained her Team Leader title, wages, and benefits. (Id., ¶ 17).

Epstein's original restrictions remained in place until August 2, 2006, when they were modified to allow her to perform limited work on her feet – standing or walking a maximum of ten to fifteen minutes per hour. (Def.'s 56.1(a)(3) Statement ¶ 20). On August 16, 2006, Epstein's restrictions were again modified to allow her to stand or walk occasionally for one-half hour at a time. (Id., ¶ 21).

Pursuant to the Program, an employee whose work restrictions force them to remain in a temporary position for a period of ten weeks after the initial injury becomes subject to a review. (Def.'s 56.1(a)(3) Statement ¶ 22). The review is used to determine whether the employee in question is able to perform the "core roles" of their previous position or will be able to do so by the end of a period of twelve weeks from the time of the initial injury. (Id., ¶ 22). Cory McMahon ("McMahon"), the Tinley Park Store Team Leader, and Staci Special ("Special"), the Executive Team Leader-Human Resources, conducted a review of Epstein. (Id., ¶ 23). McMahon concluded that Epstein's restrictions rendered her unable to perform the core roles of the Team Leader position. (Id., ¶ 24). Specifically, McMahon determined that Epstein was unable to move merchandise onto the sales floor and could not effectively supervise and train her team. (Id., ¶ 25). McMahon also

believed that the work restrictions prevented Epstein from providing the best guest service possible. (Id., ¶ 26). Epstein agreed that her department was not up to its usual standards and that the restrictions prevented her from doing her job as Team Leader. (Id., ¶ 28).

On August 28, 2006, McMahon and Special met Epstein and presented her with a list of the core roles of the Team Leader position that they believed she could not perform as a result of her restrictions (ten of twenty-four specified core tasks). (Def.'s 56.1(a)(3) Statement ¶ 29). Epstein disagreed with some of the list, though she acknowledged the restrictions limited her ability to work as a Team Leader. (Id., ¶¶ 30 - 31). During the meeting, Epstein informed McMahon and Special that she was unsure whether her doctor would release her to full duty by the following week. (Id., ¶ 32). When Epstein inquired as to the consequences of failing to be released to full duty, Special informed her she would be terminated. (Id., ¶ 33). McMahon encouraged Epstein to be safe and follow her doctor's instructions. (Id., ¶ 34). A meeting to reassess Epstein's progress was scheduled for two weeks from that time. (Id., ¶ 35).

On August 29, 2006, Epstein met with her doctor and informed him that she was having difficulty performing her job. (Def.'s 56.1(a)(3) Statement ¶ 36). She explained that her pain was worse after long periods on her feet; that her ankle became swollen and painful two days prior to the appointment; that after resting, the ankle was a normal size and almost pain free; and that she felt as though she was getting better, even though she could not stand very long while working. (Id., ¶ 36). Epstein also informed her doctor that Target may terminate her. (Id., ¶ 37). In response to the information Epstein provided, her doctor modified the restrictions, requiring that Epstein alternate working one hour on her feet with one hour of sitting. (Id., ¶ 38). The doctor also referred Epstein to an orthopedic specialist at Southland Bone and Joint Institute ("Southland"). (Id., ¶ 39).

4

On September 15, 2006, Epstein met with a physician at Southland. (Def.'s 56.1(a)(3) Statement ¶ 40). The physician further modified Epstein's restrictions, requiring that Epstein receive one fifteen-minute sitting break each hour and that she ice and elevate her left ankle as much as possible. (Id., ¶ 40). Those restrictions were to remain in place at least until September 26, 2006, the date of Epstein's next appointment. (Id., ¶ 41). On September 26, Epstein's doctor kept those restrictions in place. (Id., ¶ 42).

Toward the end of the twelve-week period in which Epstein could work in her alternative position, Special contacted Scott Taubenheim ("Taubenheim"), a corporate Human Resources Representative, to determine how to approach Epstein's future employment with Target. (Def.'s 56.1(a)(3) ¶ 43). Taubenheim advised Special to offer three options if Epstein was still unable to perform the core roles of the Team Leader position: (1) demotion to a team member position so Epstein could continue as store operator with a $3.00/hr decrease in pay; (2) termination with the option to interview for and accept a Team Leader position later, which, if it were to occur within 30 days of termination, would be accompanied by retention of seniority and rate of pay; and (3) termination without guarantee of a future position. (Id., ¶ 44).

On September 11, 2006, Epstein met with McMahon and Mike Dwyer ("Dwyer"), an Executive Team Leader, to discuss her situation. (Def.'s 56.1(a)(3) Statement ¶ 45). McMahon informed Epstein that he did not believe she could perform the core roles of the Team Leader position. (Id., ¶ 46). McMahon offered Epstein the three options as Taubenheim had described them. (Id., ¶ 49). Epstein understood that Target would not accommodate the restrictions her

physician had set in place and that if she were not cleared to work at 100 percent capability, she would have to accept one of the three options. (Id., ¶ 47). Epstein requested and received a day to consider the options. (Id., ¶ 50).

On September 12, 2006, Epstein met with Special and Dwyer to inform them that she would not quit or accept a demotion. (Def.'s 56.1(a)(3) Statement ¶ 51). Instead, Epstein accepted the option to be terminated without a guarantee of any future position. (Id., ¶ 51).

From the time of her injury through the end of her employment with Target, Epstein discussed benefits and/or medical expenses related to her injury with only Sedgwick Claims Management Services ("Sedgwick"), the third-party administrator that handles work injury claims for Target, and not with anyone at the Tinley Park store. (Def.'s 56.1(a)(3) Statement ¶ 52). Taubenheim, McMahon, and Special never communicated with either Epstein or Sedgwick about any claim for benefits Epstein made with regard to her injury. (Id., ¶ 53). Nor did Epstein inform anyone at Target she intended to file a worker's compensation claim with the Illinois Worker's Compensation Commission. (Id., ¶ 54).

On September 17, 2006, Epstein filed a worker's compensation claim. (Def.'s 56.1(a)(3) Statement ¶ 54).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the non-moving party. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d

997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party cannot, however, defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

Epstein alleges that Target discharged her in retaliation for the exercise of rights granted to her under the Illinois Worker's Compensation Act ("Act"). In order to maintain a retaliatory discharge claim under such circumstances, a plaintiff must prove: (1) she was an employee before the injury in question; (2) she exercised a right granted by the Illinois Worker's Compensation Act; and (3) her discharge was causally related to her filing a claim under the Act. *Clemons v. Mechanical Devices Co.*, 184 Ill. 2d 328, 336 (1998) (*Clemons*). "[T]he ultimate issue to be decided is the employer's motive in discharging the employee." *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 163 (1992) (*Hartlein*). If the employer chooses to come forward with a valid, non-pretextual basis for discharging the employee, the causation requirement cannot be met. *Hartlein*, 151 Ill. 2d at 160. The employer, however, "is not required to come forward with an explanation for an employee's discharge, and it remains [the employee's] burden to prove the elements of the cause of action." *Clemons*, 184 Ill. 2d at 336.

There is no dispute as to the first element of Epstein's claim – it is clear that Epstein was a Target employee from 1987 until her discharge in September 2006.

There are two ways in which a plaintiff can satisfy the second element of a retaliatory discharge claim under the circumstances in question. "The Illinois courts have recognized instances of retaliatory discharge not only where the plaintiff is fired for filing a worker's compensation claim

7

but also where the plaintiff is preemptively fired in order to prevent him from filing a claim under the Act." *Sweat v. Peabody Coal Co.*, 94 F.3d 301, 305 (7th Cir. 1996), citing *Richardson v. Illinois Bell Tel. Co.*, 156 Ill. App. 3d 1006 (1987); *Wolcowicz v. Intercraft Indus. Corp.*, 133 Ill. App. 3d 157 (1985).

Epstein has failed to produce any evidence supporting allegations that Target discharged her for filing a worker's compensation claim or in an attempt to preempt her from filing such a claim. In fact, Epstein admits that her discharge was effected only because the twelve-week period under the Program ended. By her admission, Epstein has also effectively conceded that there is no causal relationship between any worker's compensation claim she may have and her discharge.

Epstein has also alleged that the Program itself is designed to retaliate against employees who file or seek to file worker's compensation claims, though she has provided no supporting evidence for this claim. Furthermore, Epstein, in her response to Defendant's Motion for Summary Judgment, admitted that the Program is designed "to help the employee stay 'active in the job,' 'help them recover more quickly and reduce or eliminate lost-time claim costs.'" The Program allowed Epstein to remain a Target employee, allowed her to retain her salary and benefits, and accommodated her work restrictions for a period close to three months. At the end of that period, as Epstein admits, she was not summarily discharged but, rather, was given the option to remain a Target employee in a position in which she could physically perform the required duties. Epstein, as she also admits, chose not to exercise that option and voluntarily ended her employment with Target.

Because Epstein has failed to support her allegations, thereby failing to meet the second and third elements of her claim, and there are no issues as to any material fact, summary judgment is granted in Target's favor.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

Dated: April 2, 2008

JOHN W. DARRAH
United States District Court Judge